## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

**PETER J. MESSITTE**
UNITED STATES DISTRICT JUDGE

6500 CHERRYWOOD LANE
GREENBELT, MARYLAND 20770
301-344-0632

## MEMORANDUM

TO:      Frank E. Senk; Counsel of Record

FROM:    Judge Peter J. Messitte

RE:      <u>Senk v. IQVIA, Inc.</u>
No. 21-cv-1756

DATE:   February 2 9, 2024

* * *

Yesterday, February 28, 2024, the Court held an on-the-record Pretrial Conference in the above-captioned matter. In advance of the Pretrial Conference, the parties filed a Joint Proposed Pretrial Order (ECF No. 58). As discussed during yesterday's Conference, the Court will **APPROVE** the Joint Proposed Pretrial Order, subject to the following determinations and additional directions to the parties:

1. As to Mr. Senk's case, the only count before the Court is breach of contract, and the extent to which, if at all, Mr. Senk is entitled to the bonus contemplated by his Retention Bonus Agreement.

    a. Accordingly, any claim by him for damages for lost income or the loss of another bonus is not in the case.

2. The Court will not entertain evidence suggesting an alleged pattern of inappropriate dismissal of other employees by IQVIA. This case is about what allegedly happened to Mr. Senk, not anybody else.

3. The following witnesses listed by Mr. Senk on page 32 of the Joint Pretrial Order may not be called because they were not previously identified in response to IQVIA's interrogatories or supplements to the same:

    a. Intikhab Wani;

    b. Sukhwinder Singh;

    c. Deubrat Nilu;

    d. Dan Lanciloti;

    e. Abhissek Mittal;

    f. Costa Panagos; and

1

    g.  Trudy Stein.

4.  Mr. Senk must promptly confirm whether Neha Aggarwal will be appearing to testify on his behalf at trial and inform defense counsel of the same no later than 2 weeks before trial.

5.  Mr. Senk must provide defense counsel with a copy of every exhibit he intends to introduce at trial by March 15, 2024.  Other than the two exhibits identified by Mr. Senk as numbers 21 and 22 on page 28 of the Joint Proposed Pretrial Order, the Court understands that there is no dispute as to the authenticity of documents offered by either side in the case.

6.  To the extent that the parties agree to any facts, they must stipulate to those facts and jointly file these stipulations with the Court no later than 1 week before trial.

7.  Motions *in limine*, if any, must be filed no later than 2 weeks before trial; oppositions are due 1 week before trial.

8.  The parties must advise the Court as to the expected sequence and timing of witness · testimony no later than 1 week before trial.

9.  IQVIA's proposed findings of fact and conclusions of law, if any, should be filed 1 week before trial.  Mr. Senk need not provide his own proposed findings of fact and conclusions of law, but if he chooses to do so, that filing should also be filed 1 week before trial.

10. As to any deposition testimony from unavailable witnesses that will be submitted as evidence under Federal Rule of Civil Procedure 32, the parties must provide the Court with copies of the deposition transcripts no later than 1 week before trial. Consistent with the parties' designations, the Court will read the transcripts outside of the courtroom and, after doing so, will indicate that the designated portions have been received as evidence.

11. At trial, if Mr. Senk calls a particular witness whom IQVIA also intends to call, IQVIA may elicit testimony in support of its case in chief in lieu of cross examination.

12. Trial will be held from 11 a.m. to 4:30 or 5:00 p.m. on April 9 and April 10, with the possibility of continuing during the same hours for a third day on April 11, 2024.

Despite the informal nature of this ruling, it shall constitute an Order of the Court and the Clerk is directed to docket it accordingly, and to send a copy of this Order to the email listed for Mr. Senk on the case's docket.

                                               Peter J. Messitte
                                      United States District Judge

CC:    Court file

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)**

| | |
|---|---|
| FRANK E. SENK, | |
|       Plaintiff/Counterclaim-Defendant, | |
| v. | Case No. 8:21-cv-1756-JPM |
| IQVIA, INC., | |
|       Defendant/Counterclaim-Plaintiff. | |

## <u>JOINT PROPOSED PRETRIAL ORDER</u>

Pursuant to the Court's August 9, 2023 Order and District of Maryland Local Rule 106, Plaintiff and Counterclaim-Defendant Frank E. Senk ("Mr. Senk" or "Plaintiff"), now proceeding *pro se*, and Defendant and Counterclaim-Plaintiff IQVIA, Inc. ("IQVIA" or "Defendant"), by and through its counsel (jointly, the "Parties"), hereby submit this Joint Proposed Pretrial Order in advance of the Pretrial Conference scheduled for **February 28, 2024 at 3:30 PM**.[1]

**A.    A brief statement of facts that Plaintiff proposes to prove in support of his claims, together with a listing of the separate legal theories relied upon in support of each claim.**

Count I: Breach of Contract

IQVIA breached its agreement to pay Mr. Senk a $275,000.00 retention bonus after it acquired his employer GCE Solutions, Inc. ("GCE") and then terminated him for a purported "Cause" that did not comply with the terms of his June 26, 2019 Bonus Retention Agreement ("Bonus Agreement").

---

[1] Per Local Rule 106.4(c), the Parties' submission of this proposed pretrial order, which contains the information required by Local Rule 106.2, constitutes compliance with Fed. R. Civ. P. 26(a)(3).

Under Delaware law (Bonus Agreement § 10, Senk Depo. Ex. 7, Senk 00010-00016; IQVIA Memo. p. 18), a breach of contract claim has three (3) elements: (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) resulting damage to the plaintiff. Kuroda v. SPJS Holdings, L.L.C., 971 A.2d 872, 883 (Del. Ch. 2009); H-MWexford LLC v. Encorp, Inc., 832 A.2d 129, 140 (Del. Ch. 2003). It is undisputed that the Bonus Agreement has a Delaware governing law provision. Agreement is a binding contract between the parties. IQVIA breached the Bonus Agreement when it failed to pay Mr. Senk's $275,000.00 bonus. Mr. Senk was damaged in an amount of at least $275,000.00 in contractual damages—the amount of his unpaid bonus.

However, IQVIA claims it did not breach the Bonus Agreement because Mr. Senk allegedly violated (2) of its forfeiture conditions: (IQVIA Memo. pp. 19-20). Regarding these forfeiture provisions, Delaware law abhors forfeitures and they should be strictly construed. Jefferson Chemical Co. v. Mobay Chemical Co., 267 A.2d 635, 637 (Del. Ch. 1970) ("equity, of course, abhors a forfeiture. And it is not obliged to permit a party to get the advantages which a forfeiture would give him.") (citing Old Time Petroleum Co. v. Turcol, 18 Del.Ch 121, 156 A. 501 (1931)). It will disregard a forfeiture occasioned by failure to comply with the very letter of an agreement when it has been substantially performed.")

Regarding the two (2) alleged forfeiture provisions relied upon by IQVIA, the Bonus Agreement states:

Forfeiture: Recipient shall forfeit his or her right to receive any unpaid Bonus Installment ... immediately upon the occurrence of the following: (a) Recipient's employment with the IQVIA Group is terminated for Cause (as defined below);... (c) Recipient breaches any material provision of the IQVIA WPAA and/or the IQVIA CRCA." (Bonus Agreement p. 2, § 4(a) & (c), Senk Depo. Ex. 7, Senk 00010-00016 (emphasis added)).

However, "Cause" is not some general "cause," but is specifically defined in the Bonus Agreement:

"Cause" means any of the following events or circumstances: Recipient's: . . . (iii) failure to perform and material aspect of his or her duties or responsibilities to the IQVIA Group consistent with the standards reasonably expected for the position (other than by reason of a

Disability (as defined below)), which failure continues for a period often (10) days following the delivery of written notice thereof from the IQVIA Group to Recipient; (iv) failure to comply with any lawful policy or directive of the IQVIA Group, which failure continues for a period of ten (10) days following the delivery of written notice thereof from the IQVIA Group to the Recipient; (v) negligence or misconduct in performing any aspect of his or her duties to the IQVIA Group which, individually, or in the aggregate, has had or would reasonably be expected to have an adverse effect on the employer or a member of the IQVIA Group; or (vi) violation or breach of any material agreement with a member of the IQVIA Group (including the IQVIA WPAA and/or the IQVIA CRCA). (Bonus Agreement p. 2, § 4, Senk Depo. Ex. 7).

IQVIA never sent Mr. Sent a written termination letter setting forth the reasons for his termination. (Senk Decl. 17). IQVIA claims after the fact that Mr. Senk was terminated for the two (2) Causes set forth in bold above. (IQVIA Memo. pp. 20-23). However, when Mr. Senk was terminated by telephone, IQVIA did not tell him he was being terminated for either of these alleged Causes. (Senk Decl. 41-43). Rather, when she terminated Mr. Senk, Ms. Broussard read from a pre-prepared script—and she made it clear in her deposition that she did not deviate from the script. (Broussard Depo. 85:8-14). She told Mr. Senk that he was being terminated because he purportedly "violated [IQVIA's] conflict of interest, confidentiality and global investigation policy." (IQVIA-FS-000136 (emphasis added); Broussard Depo. 84:10-16; 85:8-23). This alleged reason fits squarely under Cause (iv) of the Bonus Agreement and required IQVIA to provide ten (10) days written notice to Mr. Senk and an opportunity to cease the alleged conduct. It is undisputed that IQVIA did not provide Mr. Senk with the required ten (10) days written notice. (Senk DecL. 17). Accordingly, IQVIA did not satisfy the applicable "Cause" that exactly matched its stated reason for terminating Mr. Senk and it breached the Bonus Agreement when it did not pay him his $275,000.00 retention bonus.

Moreover, regarding Cause (v)—for negligence or misconduct in the performance of his duties—Mr. Senk did not commit any negligence or misconduct in performance of his duties. (Senk Decl. 18). He followed the directions of his supervisor, Ms. Aggarwal, who was his direct supervisor both before and after the acquisition. (Senk Decl. 2, 6). She was also the person that Mr. Dearhammer told all GCE employees including Mr. Senk that he had complete faith in and they should continue to follow her direction and instructions. (Senk DecL. 4). Further, Mr.

Dearhammer candidly admitted IQVIA did not know of any performance issues related to Mr. Senk. (Dearhammer Depo. 82:15-25; 83:1-3). Additionally, there is no evidence in the record that Mr. Senk's alleged activities had or would reasonably have an adverse effect on IQVIA, a requirement specified in Cause (v). Mr. Senk's emails/messages transitioning his knowledge regarding DocQC, monitoring Mr. Guduri's activities for Ms. Aggarwal, and his continued support of existing clients did not, and could not, injure IQVIA because it did not want DocQC, wanted it transitioned to GenInvo, and Ms. Aggarwal said the Equityholder Agreement to transfer the product and to continue to support existing clients' implementation of DocQC. (Equityholder Agreement § 5, IQVIA's Ex. B filed under seal). It is not negligence or misconduct to follow a supervisor's instructions, especially after they assure the employee that the activities have been approved by the company.

Regarding Cause (vi)—breach of the CRCA—IQVIA claims Mr. Senk breached Section 3(a) of the CRCA which states:

Restricted Activities: During my employment by or service with the Company... I shall not, directly or indirectly: (1) perform or provide any Services for any Competitor, on my behalf or that of any other Person, if such Services: (A) are in relation to an offering, product, or service that is similar to or competes with a Company Offering with respect to which I had any material involvement or access to Confidential Information in the twelve month period preceding my termination and (B) are similar to the Services that I performed for the Company during the twelve month period preceding my termination, or (2) perform or provide any Services for any Person that are likely to result in my use or disclosure of Confidential Information." (CRCA § 3(A)(1)- (2), Senk Depo. Ex. 7 (emphasis added)).

There are no allegations in IQVIA's motion, and there is no evidence in the record, that the transition activities Mr. Senk performed competed with an IQVIA offering with respect to which Mr. Senk had any material involvement or access to confidential information while at IQVIA. IQVIA ignores this requirement of Section 3(a)(l)(A). To the contrary, Mr. Senk did not have any material involvement or access to confidential information regarding any product or service allegedly provided by IQVIA that competed with DocQC. (Senk Decl. 12). IQVIA did not have any product that competed with DocQC and Mr. Senk did not have access to any confidential information related to any quality control or data-anonymization services that may

have been offered by IQVIA. (Senk Decl. 12). Mr. Senk was a computer software development manager, not a quality control or data-anonymization services manager. (Senk Decl. 12). He would not (and did not) have any access to any relevant IQVIA confidential information regarding its services division, and IQVIA's motion does not identify a single piece of alleged confidential information to which Mr. Senk allegedly had access or used.

Regarding confidential information, the best IQVIA can do is state without support that "[Mr.] Senk had access to confidential and non-public information about IQVIA's products, offerings, and customers that likely assisted in his continued support and development of the DocQC software tool for Genlnvo (Facts 26)." (IQVIA Memo. p. 22). However, IQVIA's "Facts 26" citation provides no supporting evidence but simply quotes Section 3(a) of the CRCA. The Code of Conduct contains a page comprehensively dealing with the protection and treatment of IQVIA's confidential information and the CRCA. (Code of Conduct p. 26, Senk Depo. Ex. 10). Mr. Dearhammer testified that he had no knowledge that Mr. Senk violated anything on this page. (Dearhammer Depo. 100:18-19).

Additionally, there are no allegations in IQVIA's motion or evidence in the record that Mr. Senk performed any services for IQVIA that were similar to his transition activities for DocQC, another indispensable requirement of Section 3(a)(l)(B) that IQVIA ignores. Mr. Senk's transition activities were not similar to the services that he performed for IQVIA. IQVIA had no product similar to DocQC and the services Mr. Senk performed for IQVIA during his brief employment were not similar to his transition activities. (Senk Decl. 13). For all of these reasons, Mr. Senk did not breach the CRCA and the forfeiture event in Clause (vi) of the Bonus Agreement does not apply.

IQVIA also contends that Mr. Senk violated IQVIA's Code of Conduct. (IQVIA Memo. pp. 9-10,22-23). However, Mr. Senk did not review the Code of Conduct until the December 2019 deadline imposed by IQVIA. (Senk Depo. 122:5-14; 127:10-17; 128:8-17). This was well after all of the alleged conduct claimed by IQVIA to have violated the Code of Conduct because the last of Mr. Senk's emails/messages is dated October 17, 2019. (Electronic message dated 10/17/2019 from Varsha Mahajan to Mr. Senk, Senk Depo. Ex. 27). Mr. Senk's emails/messages could not have violated a document that he had not yet seen, especially since they were all at Ms.

Aggarwal's direction and the alleged conduct did not occur in the period after Mr. Senk read the Code of Conduct.

Further, the Code of Conduct instructs IQVIA employees to report any concerns they might have to their manager or a member of their local leadership team. (Code of Conduct p. 53, Senk Depo. Ex. 10). Mr. Senk did on two (2) occasions when he asked Ms. Aggarwal about the propriety of the transition tasks she assigned to him. (Senk Decl. 7). Mr. Dearhammer candidly admitted that Mr. Senk should have asked Ms. Aggarwal, the compliance hotline, the ethics hotline, his manager, or human resources if the activities were allowed. (Dearhammer Depo. 94:8-23). He stated that he did not know whether Mr. Senk had asked Ms. Aggarwal whether the transition activities were permitted by IQVIA. (Dearhammer Depo. 94:25; 95:102). When pushed on the issue, he then attempted to change his deposition testimony, but it was too late. Moreover, if IQVIA had undertaken a good faith investigation and actually asked Mr. Senk about his emails/messages and the reporting of his concerns to Ms. Aggarwal, it would have realized that it had no good faith basis to terminate Mr. Senk for allegedly violating the Code of Conduct. And if it decided otherwise, it should have given Mr. Senk the ten (10) days written notice for policy violations and an opportunity to cease the alleged conduct.

Count II: Breach of Good Faith and Fair Dealings

IQVIA argues Maryland law applies to Mr. Senk's good faith and fair dealing claim and that Maryland does not recognize this cause of action. (IQVIA Memo. pp. 26-27). However, the Bonus Agreement states: "Governing Law. This Agreement shall be governed by the laws of the State of Delaware, without giving effect to any conflict of law principles thereof." (Bonus Agreement p. 3, § 10, Senk Depo. Ex. 7). Mr. Senk's good faith and fair dealing claim directly relates to and is intertwined with the Bonus Agreement. Thus, Delaware law logically applies under Section 10 of the Bonus Agreement. However, IQVIA further argues "the covenant of good faith and fair dealing sounds in tort, and Maryland's choice of law provisions apply to tort claims." (IQVIA Memo. p. 26). Under Delaware law, an implied covenant of good faith and fair dealing is a contractual principal, not a tortious one. See e.g. Enrique v. State Farm Mut. Auto. Ins. Co., 142 A.3d 506, 512 (Del. 2016); Wood v. Baum, 953 A.2d 136, 143 (Del. 2008); Tekstrom, Inc. v. Savla, 918 A.2d 1171 (Del. 2007) ("The covenant of good faith and fair dealing arises under contract."). Delaware law applies and Maryland's tort theories are inapplicable.

Delaware courts have imposed an obligation of good faith and fair dealing when a party to a contract acts arbitrarily or unreasonably to thwart "the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." Dunlap v. State Farm Fire & Cas. Co., 878 A.2d 434, 442 (Del. 2005) (quoting Breakaway Solutions, Inc. v. Morgan Stanley & Co., 2004 WL 1949300, at *12, 2004 Del. Ch. LEXIS 125, at *49~50). That is exactly what IQVIA has done here. Further, "a violation of the implied covenant may result from an act or acts of the employer manifesting bad faith or unfair dealing achieved by deceit or misrepresentation in falsifying or manipulating a record to create fictitious grounds to terminate employment.'" Sheehan v. AssuredPartners. Inc., No. CV 2019-0333- AML, 2020 WL 2838575, at *11 (Del. Ch. May 29, 2020) at *11 (quoting £./. DuPont de Nemours & Co. v. Pressman, 679 A.2d 436, 443-444 (Del. 1996) (emphasis added)).

Here, IQVIA acted arbitrarily and unreasonably to thwart the overall purpose of the Bonus Agreement which was to reward Mr. Senk for making the transition after IQVIA acquired GCE. IQVIA fired Mr. Senk for a purported Cause under the Bonus Agreement when none existed in order to deprive him of his $275,000.00 bonus. This was an unreasonable and arbitrary use of IQVIA s superior position to achieve its desired result.

Additionally, IQVIA terminated Mr. Senk because he purportedly "violated [IQVIA's conflict of interest, confidentiality and global investigation policy," yet it did not give him the ten (10) day notice required for policy violations under the Bonus Agreement and would not even tell him the purported conduct leading to his termination. (Senk Decl. 17). This also was arbitrary and unreasonable and done in bad faith. Afterwards, IQVIA manufactured an alleged violation of the CRCA and the Code of Conduct when its actions were questioned—as shown above there was no violation of the CRCA or Code of Conduct. Further, IQVIA has not produced a single contemporaneous document memorializing that it actually fired Mr. Senk because he allegedly violated the CRCA and/or Code of Conduct. Moreover, during its investigation, IQVIA did not ask Mr. Senk a single question about the emails/messages that allegedly led to his termination or provide him with a chance to explain them. (Senk Decl. 23). It also did not ask whether he had ever reported his concerns to anyone. (Senk DecL. 23). This is certainly a lack of good faith and was arbitrary and unreasonable. Finally, the reasonable inference from the evidence is that Mr. Senk's firing was part of IQVIA's financial belt tightening after GCE's large

pharmaceutical client's contract was renewed at a lower dollar and IQVIA went on a firing spree of GCE's highly compensated employees who had made the transition. (Broussard Depo. 90:15-25; 91:1-10; Aggarwal Depo. 79:11-12; 80:1-3; 80:15-19; 82:10-25; 83:1-25; 84:1-25; 85:1-22; Dearhammer Depo. 55:24-25; 56:1-6). IQVIA did not want to keep highly compensated employees like Mr. Senk or pay his $275,000.00 bonus for financial reasons and fired him in bad faith.

**B.**     **A brief statement of facts that Defendant proposes to prove or rely upon as a defense thereto, together with a listing of the separate legal theories relied upon in support of each affirmative defense.**

*Statement of Facts to be Proven by Defendant.*

Background on IQVIA, GCE, and GenInvo.   IQVIA is a global provider of analytics, technology solutions, and clinical-research services to the life-sciences industry. In mid-2019, IQVIA acquired GCE Solutions US, LLC ("GCE"), a company focused on staffing resources and other services to pharmaceutical and life-sciences clients. By the acquisition, GCE became a subsidiary of IQVIA when the transaction closed on July 9, 2019. But there were pieces of the GCE business that IQVIA did not acquire and that were carved out from the transaction; those pieces were spun off into a new carveout business, originally called "ClinTech" and later "GenInvo" (hereafter "GenInvo" for simplicity). GCE likewise spun off several GCE assets and products into GenInvo, including two software programs: "DocQC" and "Shadow." After the transaction, then, GenInvo was never an IQVIA business or otherwise under the IQVIA umbrella, and "DocQC" and "Shadow" became GenInvo products—they were never IQVIA products.[2]

---

[2] "DocQC" is a program designed to automate certain quality-control checks and reviews for documents used in clinical-research processes; at the time when IQVIA acquired GCE and continuing through today, IQVIA offered and offers quality-control services to its clients similar to the services performed by DocQC. "Shadow" is program focused on data-anonymization for clinical research documents; IQVIA offers data-anonymization services and capabilities similar to Shadow to its clients.  IQVIA chose not to acquire the DocQC or Shadow products in the transaction for two main reasons: (1) IQVIA was focused on the staffing

GCE was previously led by its founder, Neha Aggarwal ("Aggarwal"). When IQVIA acquired GCE, it hired Ms. Aggarwal and a group of other GCE employees, including Plaintiff Frank Senk, who was one of the more senior members of the legacy GCE team. Those employees (including Mr. Senk) signed a variety of employment-related agreements upon joining IQVIA, including a Confidentiality and Restrictive Covenants Agreement ("CRCA") that restricted them from certain outside work activities. Along the same lines, Ms. Aggarwal instructed the legacy GCE employees who transitioned to IQVIA (including Mr. Senk) that they should discontinue GenInvo-related work after July 9, 2019, including on the DocQC program.

The only narrow exception pertained to Ms. Aggarwal herself, who signed a unique restrictive covenant agreement with IQVIA that temporarily allowed her to carry out a limited set of "status quo" activities related to the ClinTech/GenInvo business for the shorter of: (a) up to six (6) months after the closing date, or (b) until she transitioned the ClinTech/GenInvo business to a new CEO. Further, even that limited activity by Ms. Aggarwal was expressly conditioned on an agreement that GenInvo "not further develop its technology" and "not perform any business development activities, solicit or engage new customers, or enter into new customer contracts." No other employees were encompassed by this arrangement—only Ms. Aggarwal.

<u>Mr. Senk's Employment Onboarding with IQVIA.</u> As noted, Frank Senk joined IQVIA effective July 9, 2019, when IQVIA acquired GCE, with the title of Director of Programming. IQVIA hired Mr. Senk on an "at-will" basis with an annual salary of $170,000. As noted above, Mr. Senk signed CRCA with IQVIA, through which he agreed, in relevant part, as follows:

> During my employment by or service with the Company … I shall not, directly or indirectly: (1) perform or provide any Services for any Competitor, on my own behalf or that of any other Person, if such Services: (A) are in relation to an offering, product, or

---

side of the GCE business, not the technology side, especially since IQVIA had its own technology business; and (2) GCE wanted a higher price for the DocQC and Shadow products than IQVIA was willing to pay.

service that is similar to or competes with a Company Offering with respect to which I had any material involvement or access to Confidential Information in the twelve month period preceding my termination and (B) are similar to the Services that I performed for the Company during the twelve month period precedent my termination; or (2) perform or provide any Services for any Person that are likely to result in my use or disclosure of any Confidential Information.[3]

Mr. Senk separately received a Retention Bonus Agreement (the "Bonus Agreement") from IQVIA, which granted him an opportunity to earn additional compensation up to $275,000—payable in two installments on the first and second anniversaries of the transaction closing (*i.e.*, 40% in July 2020 and the remaining 60% in July 2021)—if Mr. Senk satisfied certain conditions. One of those conditions was that Mr. Senk could not trigger a "forfeiture" event, which the Bonus Agreement defined to include: (a) termination for "Cause"; (b) voluntary resignation; or (c) breach of any material provision of the CRCA. The Bonus Agreement defined "Cause" to include, among other circumstances: "(v) negligence or misconduct in performing any aspect of [his] duties or responsibilities to the IQVIA group which … has had or would reasonably be expected to have an adverse effect on … the IQVIA Group" and "(vi) violation of breach of any material provision of any agreement with … the IQVIA Group (including … the IQVIA CRCA)."

Because Mr. Senk was employed on an at-will basis, the Bonus Agreement separately contemplated what would occur if IQVIA terminated Senk's employment during either of the two yearlong periods encompassed by the Bonus Agreement but did not have "Cause" to do so: Mr. Senk could be eligible to receive a prorated percentage of the bonus.[4]

In August 2019, IQVIA provided Mr. Senk with a link to its Code of Conduct (the "Code"), which is IQVIA's "highest level policy document defining the responsibilities … for ethical

---

[3] The capitalized terms are separately defined by the CRCA.

[4] By way of illustration, if IQVIA had hypothetically terminated Mr. Senk's employment without "Cause" exactly six months into his employment with IQVIA, the terms of the Bonus Agreement would then render Mr. Senk eligible for 50% of the first bonus installment—*i.e.*, $55,000 ($110,000 x 0.50).

business conduct." Among other relevant provisions, the Code instructs employees that they "must avoid any activity or relationship that might conflict – or appear to – with IQVIA's interests," and it goes on to explain that employees cannot "compete with IQVIA," since they "owe a duty to IQVIA to advance the Company's legitimate interests when the opportunity to do so arises." One of the Code's final statements reads as follows: "We are each responsible for our own actions. No illegal or unethical act can be justified by claiming that higher management or a client ordered it. You always have resources to contact for assistance such as those listed in this Code and the 'Help and Information' section." The Code is publicly available on IQVIA's website.[5]

Mr. Senk's False Statements During IQVIA's Investigation. In late 2019, IQVIA received a report that legacy GCE employees who transitioned to IQVIA were continuing to perform work for GenInvo, including on the DocQC program that IQVIA did not acquire. IQVIA launched an investigation, and, as part of that investigation, IQVIA interviewed Mr. Senk (among others). During Mr. Senk's interview, IQVIA asked Mr. Senk to share what he knew about any IQVIA employees continuing to work for GenInvo, including on DocQC. In response, Mr. Senk said that he did not know of anyone at IQVIA who was actively working on DocQC, except for one other employee (Anurag Guduri) who may have been "transitioning" the product, although Mr. Senk disclaimed any direct knowledge. Mr. Senk did not disclose any post-transaction involvement by him whatsoever related to GenInvo or DocQC, even as to so-called "transition" or "indirect" work. Instead, Mr. Senk squarely denied any personal involvement with GenInvo or DocQC.[6]

But IQVIA's continuing investigation uncovered myriad real-time documents revealing that Mr. Senk's responses were false—that, in reality, he had continued to work on DocQC for

---

[5] *See* https://www.iqvia.com/about-us/code-of-conduct (linking Code in more than a dozen languages).

[6] Mr. Senk certainly did not say that he had continued to work on DocQC or other GenInvo projects with Ms. Aggarwal's approval or knowledge (which is the excuse he has invoked during much of this litigation).

GenInvo for months after joining IQVIA in July 2019, including by: (a) sharing ideas with GenInvo executives (oftentimes with @geninvo.com email addresses) on how to enhance DocQC; (b) pitching and marketing DocQC to third parties; (c) working with GenInvo executives on a multi-year DocQC proposal between GenInvo and the same client that he supported for IQVIA; (d) supervising and monitoring another employee's work on DocQC; and more. IQVIA will walk the Court through all these real-time exhibits (and Mr. Senk's admissions about them) at trial.

IQVIA's Termination of Mr. Senk for Cause.  Following its interview with Mr. Senk, and based on IQVIA's overall investigation into GenInvo-related issues, IQVIA terminated Mr. Senk's employment in February 2020 for two independent but overlapping reasons: (1) his improper work for GenInvo, including on DocQC, after July 9, 2019; and (2) his false and dishonest statements about those topics in IQVIA's investigation. IQVIA treated Senk's termination as one for "Cause" under the Bonus Agreement because, in its reasonable and good-faith view, Mr. Senk's actions violated his CRCA with IQVIA and constituted misconduct that had an adverse effect on IQVIA. And because IQVIA terminated Senk's employment for "Cause," Mr. Senk forfeited any bonus payment under the Bonus Agreement. IQVIA's investigatory findings led IQVIA to terminate several other employees for similar reasons.

In the days following his employment termination, Mr. Senk continued to perpetuate the false narrative that he had zero involvement in any GenInvo or DocQC work after joining IQVIA, writing to IQVIA in various communications that he "ceased work on DocQC immediately after the merger," "was not working on any GENINVO projects post-merger," and "had no connection to any GENINVO projects post-merger." These statements were all false. Mr. Senk certainly did not tell IQVIA (at that time or at any prior time) that he was allegedly performing work for GenInvo and/or DocQC with the approval or knowledge of Ms. Aggarwal or anything of the sort.

### *Legal Theories Relied Upon for Defendant's Position.*

Mr. Senk's remaining claim for breach of contract hinges on whether he can prove that IQVIA did not have "Cause" to terminate his employment, such that IQVIA should not have treated Mr. Senk's eligibility for payment under the Bonus Agreement as forfeited.

Under Delaware law (which governs the Bonus Agreement), "the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). Further, "where a contractual obligation is subject to a condition precedent, that obligation will only mature on satisfaction of a contractually specified condition." *S'holder Rep. Servs., LLC v. Shire US Holdings*, 2020 WL 6018738, at *17 & n.271 (Del. Ch. Oct. 12, 2020), *aff'd*, 267 A.3d 370 (Del. 2021) (collecting cases). Here, the Court already concluded that the Bonus Agreement prescribed conditions precedent for Mr. Senk's eligibility for payment, among them that Mr. Senk refrain from activity that would amount to "Cause" for termination." *See* Dkt. 45, Tr. 64:7-13. Under the Bonus Agreement, such activity would include breaching a material provision of an agreement with IQVIA (including the CRCA) or engaging in "negligence or misconduct" that would "reasonably be expected to have an adverse effect" on IQVIA. The evidence at trial will establish that IQVIA reasonably concluded that Mr. Senk engaged in both categories of activity here—either of which supports IQVIA's decision and dooms his claim.

Importantly, the Bonus Agreement expressly empowered IQVIA with the discretion to make any necessary determinations under the Agreement: "All determinations regarding the Retention Bonus … shall be made by IQVIA in accordance with the terms of this Agreement and shall be final, conclusive and binding on all parties." Under Delaware law, then, Mr. Senk can only prevail if he proves that IQVIA's determination was the result of "fraud or bad faith." *Miller v.*

*Trimont Global Real Estate Advisors LLC*, 587 F. Supp. 3d 170, 196 & n.166 (D. Del. 2022) (holding that similar language triggered more deferential review) (collecting cases). To analogize to the employment-discrimination context, this means the Court should not "sit as a kind of super-personnel department weighing the prudence of employment decisions[.]" *Floyd v. Wash. Suburban Sanitary Comm'n*, 2016 WL 4415055, at *7 (D. Md. Aug. 19, 2016) (Messitte, J.) (quoting *DeJarnett v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Rather, to show "fraud or bad faith," Mr. Senk will need to establish that IQVIA did not "honestly believe" the basis for its decision. *Cf. Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007). Based on the evidentiary record to be presented to the Court, Mr. Senk cannot do so here.

For one, the evidence will demonstrate that IQVIA made a reasonable and good-faith determination that Mr. Senk's work on DocQC for GenInvo in and after July 2019 in myriad ways—including going so far as to assist GenInvo executives with the preparation and strategy behind a new multiyear GenInvo contract proposal for DocQC with the same pharmaceutical client he was supporting for IQVIA—amounted to "Cause"-triggering conduct. More specifically, IQVIA concluded that Mr. Senk's activity both: (i) breached his CRCA insofar as he was working for an IQVIA competitor on products similar to IQVIA offerings, and (ii) constituted broader misconduct that could reasonably be expected to have an adverse effect on IQVIA. But there was another—and even more straightforward—rationale. IQVIA reasonably determined that Mr. Senk engaged in serious misconduct when he lied to IQVIA during its investigation—falsely disclaiming and denying any personal involvement in DocQC-related work for GenInvo. Mr. Senk perpetuated those lies even after his employment termination. This misconduct, standing alone, scuttles any suggestion that IQVIA lacked "Cause" to terminate Mr. Senk's employment.

Because Mr. Senk cannot carry his burden to show that IQVIA lacked a reasonable basis to believe his employment should be terminated for "Cause," his breach-of-contract claim fails.

## C.     **Similar statements as to any counterclaim, crossclaim, or third-party claim.**

### *Plaintiff's Position.*

IQVIA IS NOT ENTITLED TO JUDGMENT ON ITS BREACH OF CONTRACT COUNTERCLAIM (COUNT I)

IQVIA's Count I claims Mr. Senk beached the CRCA. Delaware law applies to IQVIA's breach of contract claim because the CRCA has a Delaware governing law provision. (CRCA § g, Seak Depo. Ex. 7). Under Delaware law, a breach of contract claim has three (3) elements: (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) resulting damage to the plaintiff. Knroda, 971 A.2d at 883; H-M Wexford, 832 A.2d at 140.

Regarding the first element—existence of a contract—it is undisputed that the CRCA is a binding contract between the parties. Regarding the second element—breach—as explained above, Mr. Senk did not breach the CRCA. Mr. Senk incorporates by reference his prior CRCA arguments in Sections IV(A). Mr. Senk simply performed the tasks assigned by his GCE supervisor whom IQVIA had directed him to follow. (Senk Decl. 6). IQVIA cannot prove Mr. Senk breached the CRCA by performing services for a competitor or used and/or disclosed any of IQVIA's confidential information. IQVIA is not entitled to judgment on its claim that Mr. Senk breached Section 3(a)(l)-(2) of the CRCA.

Regarding the third element—damages—IQVIA argues without citing any supporting evidence (there is none) that it lost some unspecified "business opportunity" due to Mr. Senk's activities. (IQVIA Memo. p. 31). This conclusory allegation is insufficient for judgment purposes. Similarly, IQVIA claims in conclusory fashion that it was damaged by the time Mr. Senk spent on the pertinent emails/messages. Again, there is no evidence of any actual damages to IQVIA due to these communications.

IQVIA IS NOT ENTITLED TO JUDGMENT ON ITS BREACH OF FIDUCIARY DUTY COUNTERCLAIM (COUNT II)

To prevail on its breach of fiduciary duty claim, IQVIA must produce undisputed evidence of the existence of a fiduciary duty, its breach by Mr. Senk, and harm and damages to IQVIA. Plank v. Cherneski, 231 A.3d 436, 466 (Md. 2020). IQVIA claims Mr. Senk breached his fiduciary duty as an IQVIA employee because he allegedly performed transition activities as directed by Ms. Aggarwal. (IQVIA Counterclaim 32-33). Mr. Senk did not violate any fiduciary duty, rather he duly complied with his employer's demands after Mr. Dearhammer had specifically told him and other GCE's employees to follow Ms. Aggarwal's directions, that he had all confidence and faith in her, and that she was still in charge of CGE after the acquisition. (Senk Decl. 4). When Mr. Senk had questions about the assigned tasks, he took them to his manager and a member of his local management team. (Senk DecL. 7). Contrary to IQVIA's assertions, if Mr. Senk had not followed Ms. Aggarwal's instructions and Mr. Dearhammer's directions to follow what she said, he would have then been accused of insubordination and breaching his fiduciary duty to IQVIA. IQVIA cannot have it both ways. Further, IQVIA asserts in summary fashion that it lost business opportunities, but there is no evidence that it actually lost any such alleged business opportunities or even what they were. Similarly, IQVIA also contends without any support that it was harmed by paying Mr. Senk's salary. There is no evidence supporting this assertion, nor has IQVIA offered any evidence of its alleged damages, a fatal defect to its breach of fiduciary duty claim.

IQVIA IS NOT ENTITLED TO JUDGMENT ON ITS DECLARATORY JUDGMENT COUNTERCLAIM (COUNT III)

IQVIA is not entitled to a declaratory judgment because it has not met the burden of showing that there is "no genuine dispute" as to whether it fulfilled all obligations to Mr. Senk under the Bonus Agreement. See Fed. R. Civ. P. 56(a). Mr. Senk incorporates by reference his arguments in Sections IV(A) and V(A) above regarding the breach of contract claim and counterclaim. As articulated above, there are questions of material fact as to the real reason(s) Mr. Senk was terminated and whether his termination complied with a forfeiture event listed in the Bonus Agreement. Therefore, at the very least, Mr. Senk has presented sufficient evidence to create a factual dispute as to whether IQVIA failed to fulfill its obligations under the Bonus Agreement. With all these material questions of fact pending, IQVIA is not entitled to judgment on its declaratory judgment claim.

16

### *Defendant's Position.*

IQVIA asserts counterclaims against Mr. Senk for: (1) breach of contract as to Mr. Senk's CRCA with IQVIA; (2) breach of the fiduciary duty of loyalty; and (3) declaratory judgment. The same factual overview that bears on Mr. Senk's remaining breach-of-contact claim against IQVIA likewise informs that salient legal issues that support judgment in IQVIA's favor on its counterclaims. As to the governing legal principles, IQVIA summarizes those as follows:

Breach of Contract. Like the Bonus Agreement, the CRCA is governed by Delaware law, and so to prevail, IQVIA must show: "(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage[.]" *H-M Wexford LLC*, 832 A.2d at 140. The evidence at trial will bear out each element. First, Mr. Senk owed IQVIA contractual obligations under the CRCA beginning on July 9, 2019, when he joined an "IQVIA business." Second, Mr. Senk breached those obligations through his ongoing work in support of DocQC for GenInvo after July 9, 2019, in all the ways discussed above. And third, IQVIA was damaged by Mr. Senk's breaches, including in the form of the substantial compensation it paid Mr. Senk while he was improperly and disloyally supporting a competitive and its developing product(s).

Breach of Fiduciary Duty of Loyalty. To prevail on its fiduciary disloyalty claim, IQVIA must establish "(i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary." *Plank v. Cherneski*, 231 A.3d 436, 466 (Md. 2020) (quoting *Froelich v. Erickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000)). IQVIA will do so at trial here. First, Maryland law recognizes that "a corporate officer or an employee has a duty of 'undivided and unselfish loyalty' to the corporation or employer." *Fundamental Admin. Servs., LLC v. Anderson*, 2014 WL 5797125, at *3 (D. Md. Nov. 6, 2014) (quoting *Md. Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978)). Indeed, Mr. Senk conceded at summary judgment

17

that he owed a duty of loyalty to IQVIA while he was serving as its Director-level employee. Second, Mr. Senk breached that duty through his ongoing work on DocQC for GenInvo after joining IQVIA. Importantly, this claim is broader than IQVIA's CRCA-based claim—Mr. Senk's work for GenInvo violated his duty of loyalty to IQVIA irrespective of whether the Court agrees that GenInvo was a "competitor" within the meaning of the CRCA because in either scenario, Mr. Senk was not "act[ing] solely for the benefit of [IQVIA]." *Metzner*, 382 A.2d at 568. Third, IQVIA was harmed by Mr. Senk's breach, including by paying him substantial compensation throughout his period of disloyalty, and IQVIA is entitled to recover the value of that compensation. *See, e.g.*, *Brightview Grp., LP v. Teeters*, 2021 WL 1238501, at *19 (D. Md. Mar. 29, 2021) (citing *Md. Credit Fin. Corp. v. Hagerty*, 216 Md. 83 (1958)). IQVIA seeks such a recovery here.

    <u>Declaratory Judgment.</u>  The Federal Declaratory Judgment Act gives a federal district court the power, in any 'case of actual controversy within its jurisdiction,' to 'declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'" *Empire Fire & Marine Ins. Co. v. Gross*, 2013 WL 524766, at *1 (D. Md. Feb. 12, 2013); 28 U.S.C. § 2201. Here, IQVIA seeks a declaration from this Court making clear that IQVIA does not owe Mr. Senk any further obligations under the Bonus Agreement—including any claimed payment obligations—because Mr. Senk forfeited any such entitlement.

## D.    Any amendments required of the pleadings.

    None.

## E.    Any issue in the pleadings that is to be abandoned.

    Mr. Senk concedes that one count of Fraud was dropped by the Plaintiff at Summary Judgement. However, two (2) plaintiff counts and three (3) defendant counterclaims were

continued to trial. How can the defendant make claims about loyalty but dismiss plaintiff claims of good faith and fair dealing.

For its part, IQVIA reminds the Court that it dismissed at the summary-judgment stage Plaintiff's claims for breach of the duty of good faith and fair dealing (Count II) and fraudulent inducement (Count III), the latter of which Plaintiff voluntarily withdrew. *See* Dkt. 50.

**F.      Stipulations of fact or, if the Parties are unable to agree, requested stipulations of fact.**

*Plaintiff's Proposed Stipulations*

1.      On June 26, 2019, IQVIA acquired GCE from Ms. Aggarwal but did not acquire two (2) of GCE's software products (DocQC and Shadow) in the acquisition.

2.      On June 26, 2019, Mr. Intikhab Wani, IQVIA VP HR and Mr. Senk signed a 2-year offer letter that included a retention bonus contract.

3.      On June 26, 2019, Ms. Trudy Stein, IQVIA EVP Chief Human Resources Officer and Mr. Senk signed two documents:  [1] a confidentiality and restrictive covenants agreement, and [2] work product assignment agreement.

4.      On July 9, 2019, IQVIA and Ms. Aggarwal consummated the GCE acquisition.

5.      On July 9, 2019, IQVIA and Ms. Aggarwal entered into a Equityholder Restrictive Covenant Agreement that allowed for the transition of GCE software products (DocQC and Shadow) to Genlnvo, Inc. ("Genlnvo").

6.      After July 9, 2019, Ms. Aggarwal became President of Genlnvo.

7.      After July 9, 2019, DocQC and Shadow were transitioned to Genlnvo.

8.      On July 9, 2019, IQVIA did not provide a copy of the Equityholder Agreement to Mr. Senk.

9.      At the time of the GCE acquisition, IQVIA did not have any software product that performed the same or similar function as DocQC.

10.     After the acquisition, Mr. Dearhammer was responsible for GCE's financial performance.

11.     After the acquisition, Ms. Aggarwal was responsible for GCE functions until her resignation in Jan 2020.

12.     After the acquisition, Mr. Senk reported to Ms. Aggarwal who reported to Mr. Dearhammer.

13.     After the acquisition, Mr. Dearhammer, Ms. Aggarwal and Mr. Senk traveled to India to announce the acquisition to GCE and IQVIA employees.

14.     After the acquisition, Mr. Senk continued as lead of a technical team in support of a large pharmaceutical client.

15.     In December 2019, IQVIA renewed the contract of the technical team in support of a large pharmaceutical client.

16.     After the acquisition, four (4) senior staff, given a IQVIA retention bonus, were not paid said bonus: Mr. Sukhwinder Singh (Chief Financial Offer), Mr. Frank Senk (GCE Director), Ms. Yvonne Moores (European Head), and Mr. Abhissek Mittal (GCE Director).

17.     In November or December 2019, IQVIA commenced an investigation into the transition related-activities to GenInvo.

18.     On December 19, 2019, IQVIA interviewed Mr. Senk asking about transition-related work to GenInvo.

19.     After December 19, 2019, IQVIA continued to interview other employees about transition-related work to GenInvo.

20.     IQVIA did not interview Ms. Aggarwal, at any time, about transition-related work to GenInvo.

21.     In January 2020, Ms. Aggarwal resigned from IQVIA.

22.     On Wednesday, February 26, 2020, Ms. Broussard and Ms. Anna O'Connor terminated Mr. Senk in an audio phone call.

23.     Prior to Mr. Senk's termination, IQVIA did not provide performance-related issues to Mr. Senk.

24.     Prior to Mr. Senk's termination, IQVIA did not provide a 10-day notice as required by the IQVIA CRCA signed by both parties.


### *Defendant's Proposed Stipulations*

1.     Mr. Senk became an IQVIA employee effective July 9, 2019, in the role of Director of Programming.

2.       Mr. Senk's offer letter with IQVIA stated that he would be an at-will employee, and that he would be paid an annual base salary of $170,000, plus the opportunity to earn a bonus.

3.       In June 2019, Mr. Senk signed a Confidentiality and Restrictive Covenants Agreement with IQVIA, which Mr. Senk read and understood.

4.       In June 2019, Mr. Senk additionally signed a Retention Bonus Agreement with IQVIA, which Mr. Senk read and understood.

5.       Through the Retention Bonus Agreement, Senk was given an opportunity to earn bonus compensation from IQVIA totaling $275,000—payable in two installments on the first and second anniversaries of the closing date of the GCE transaction (*i.e.*, 40% in July 2020 and the remaining 60% in July 2021)—if Mr. Senk satisfied certain conditions for payment.

6.       Those conditions included: (a) entering into a CRCA with IQVIA; (b) remaining continuously employed for the relevant period; (c) maintaining satisfactory levels of performance; (d) not triggering a "forfeiture" event, as defined in Section 4 of the Bonus Agreement; and (e) maintaining an acceptable level of employee attrition. Mr. Senk understood he needed to satisfy all these conditions to be eligible for payment under the Bonus Agreement.

7.       The Bonus Agreement separately provided that if Mr. Senk's employment were terminated without "Cause" during the relevant period, he would then be eligible for a prorated portion of the bonus payment based on the length of his IQVIA employment to that point.

8.       In December 2019, IQVIA management conducted an interview with Mr. Senk during which they asked him to share information that Mr. Senk had about legacy GCE employees who had continued to work on GenInvo projects after joining IQVIA, including DocQC.

9.      During that interview, Mr. Senk stated that he did not know of anyone working actively on DocQC; Mr. Senk indicated that Anurag Guduri may have been continuing to transition the project, but Mr. Senk stated that he lacked any actual knowledge.

10.     During that interview, Mr. Senk did not disclose that he had personally been involved with any GenInvo or DocQC work since the closing date on July 9, 2019.

11.     During that interview, Mr. Senk did not say anything about believing that Ms. Aggarwal had approved him to keep working on DocQC or other GenInvo projects.

12.     IQVIA terminated Mr. Senk's employment effective February 26, 2020.

13.     Two days later, on February 28, 2020, Mr. Senk filed an "Ethics Report" with IQVIA in which he stated, among other things, that he "ceased work on DocQC immediately after the merger" and "had no connection to GENINVO projects post-merger."

**G.      The details of the damages claimed or any other relief sought as of the date of the pretrial conference.**

_**Plaintiff's Position.**_

Plaintiff's Potential Relief. Plaintiff contends that IQVIA offered GCE senior managers, including Mr. Senk, retention bonuses necessary to secure the purchase of GCE. IQVIA then offered Ms. Aggarwal a senior position that continued her management of all GCE functions. Mr. Senk continued to directly report to Ms. Aggarwal who advanced a merger strategy of GCE and IQVIA.

Ms. Aggarwal, who founded GCE, was given additional responsibility under contract with IQVIA, to secure the transfer of former GCE employees and select software products to GenInvo, a company that she owned. Mr. Dearhammer empowered Ms. Aggarwal to lead GCE as if nothing had changed while overseeing the transition of staff and products from GCE to GenInvo.

Ms. Aggarwal asked GCE employees to transition former GCE work to GenInvo staff over a 6-month time period. During this period, Ms. Aggarwal directed GCE staff, including Mr. Senk, to provide transitional support of former GCE staff and product to GenInvo.

At the time of the purchase, IQVIA needed GCE senior staff to maximize retention goals set-forth in retention contracts. IQVIA also declared some senior GCE managers redundant to increase profit. However, IQVIA needed Mr. Senk to continue work on a major pharmaceutical client contract that accounted for approximately one-third of GCE's income.

When the relationship between Ms. Aggarwal and Mr. Dearhammer soured, given Ms. Aggarwal's position at GenInvo, IQVIA started an investigation of the GCE to GenInvo transitional activities. The investigation into transitional activities led multiple GCE senior managers to resign or be terminated, starting with to Ms. Aggarwal's resignation in January 2020.

After Ms. Aggarwal's resignation, Mr. Senk was incorrectly and improperly terminated for "Cause" in February 2020. After Mr. Senk's termination, IQVIA was able to renew the contract with a major pharmaceutical client for which Mr. Senk had been leading a technical team of 14 staff.

Mr. Senk's dismissal caused significant financial hardships resulting in the loss of his 2019 GCE bonus, unemployment in 2020, loss of 2020 income, loss of 2020 income as Mr. Senk started a consulting company, loss in 2020 wages due to lower pay, and loss of IQVIA retention bonus for 2020 and 2021 as promised by his IQVIA employment contract.

| Description | Total Damages |
|---|---|
| Loss of GCE annual bonus from 2019 | $17,800 |
| Loss of annual bonus in 2020 | $17,000 |
| Loss of IQVIA retention bonus in 2020 | $110,000 |
| Loss of income in 2020 due to unemployment | $10,890 |
| Loss of income in 2020 due to consulting company | $10,000 |
| Loss of income in 2020 due to wages | $33,960 |
| Loss of annual bonus in 2020 | $17,000 |
| Loss of IQVIA retention bonus in 2021 | $165,000 |
| | |
| Total | $381,650 |

Most important, Mr. Senk's reputation, after more than 30 years in the industry, and after participating in more than a dozen FDA drug submissions, that helped patients and benefitted companies, was severely damaged. For all these reasons, Mr. Senk petitions the court to rule in favor of IQVIA' breach of contract for at least the agreed retention bonus of $275,000 with additional penalties at the discretion of the court.

Under Delaware law, the plaintiff has shown evidence to advance Count I: a breach of contract claim having three (3) elements: (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) resulting damage to the plaintiff. Knroda, 971 A.2d at 883; H-M Wexford, 832 A.2d at 140. Additionally, the plaintiff has shown evidence to advance Count II: Breach of Good Faith and Fair Dealings.

Defendant's Counterclaims. As to IQVIA's claim that Mr. Senk had no right to breach of contract, IQVIA has not disputed the fact that they benefitted financially from the purchase of GCE. IQVIA's termination of Mr. Senk increased GCE profits thereby delivering IQVIA profits that were benefitted Mr. Dearhammer.

IQVIA's counterclaim based on disloyalty and breaching behavior cannot be supported. Throughout Mr. Senk's employment, he communicated directly with Ms. Broussard who led the 2020 contract renewal discussion with GCE's large pharmaceutical company. The contract was

renewed per Ms. Broussard's deposition. Mr. Senk earned his 2019 and 2020 salary paid by IQVIA through his hard work, transparency and determination to do what is right for GCE/IQVIA.

### ***Defendant's Position.***

Plaintiff's Potential Relief.  As to Mr. Senk's sole remaining claim for breach of contract, his potential damages would be limited to some portion of the retention bonus he forfeited under the Bonus Agreement—a maximum of $275,000, spread across two installments ($110,000 after the first anniversary date, and another $160,000 after the second). To be clear, IQVIA maintains that Mr. Senk cannot and should not recover any damages because he cannot satisfy his threshold burden to establish liability for the reasons stated. But even if Mr. Senk could prove at trial that IQVIA made a bad-faith determination to terminate his employment for "Cause," that would then mean that IQVIA had terminated his employment without "Cause" effective February 26, 2020, and the Bonus Agreement contemplates how Mr. Senk's bonus payment would be calculated in that scenario. Under Section 5 of the Bonus Agreement, Mr. Senk would be eligible to receive a prorated portion of the bonus amount applicable to the relevant period. Here, Mr. Senk's employment was terminated during the first one-year period, meaning he would be eligible for a prorated portion of the first $110,000 bonus installment. And based on Mr. Senk's 232-day period of employment (from July 9, 2019 through February 26, 2020), that would equate to 63.56% of the first $110,000 bonus installment, or slightly less than $70,000 ($110,000 x 0.6356 = $69,916). In other words, even if Mr. Senk were to prevail on his claim by providing that IQVIA breached the Bonus Agreement by terminating him without "Cause," the plain terms of the Bonus Agreement would still leave him with a maximum potential recovery of $69,916.

IQVIA's Counterclaim. IQVIA's declaratory-judgment counterclaim does not call for damages or monetary relief, but rather a judicial declaration that IQVIA owes Mr. Senk no obligations under the Bonus Agreement. As to its other counterclaims, IQVIA seeks a remedy in the form of the compensation that it paid Mr. Senk during his period of disloyalty and breaching behavior. *See, e.g., Hagerty*, 216 Md. 83 (1958) (holding that former employee was not entitled to compensation "he otherwise would have been entitled to receive" because he willfully and materially breached his duty of loyalty to his employer); *accord McGinnis v. Rogers*, 262 Md. 710, 732 (1971) (similar). Across the approximately seven and a half months that IQVIA paid Mr. Senk's six-figure salary, his earnings totaled about $116,000. Given the egregiousness of Mr. Senk's misconduct—which IQVIA submits was only compounded when Mr. Senk lied about his behavior to IQVIA—IQVIA believes it would be appropriate for the Court to award IQVIA the entirety of the compensation it paid to Mr. Senk while he was employed—totaling $116,000—and this is what IQVIA anticipates requesting from the Court at the close of evidence.

But at minimum, the Court should fashion a remedy that corresponds to the four-month period from July 2019 through mid-October 2019 during which Mr. Senk was unquestionably continuing to work with GenInvo executives to advance DocQC and GenInvo's interests over IQVIA's. That four-and-a-half month period comprises about 60% of Mr. Senk's total employment tenure with IQVIA, such that IQVIA should be entitled to recoup 60% of the compensation is paid to Mr. Senk—totaling just under $70,000 ($69,600 = $116,000 x 0.60).

H.     **A listing of each document or other exhibit, including summaries of other evidence, other than those expected to be used solely for impeachment.**

*Plaintiff.*

Plaintiff plans to introduce the following exhibits:

| | Document | Bates Range |
|---|---|---|
| 1. | 2019-06-26 Mr. Senk's IQVIA Offer Letter from HR | SENK00007-09 IQVIA-FS-0000001-03 |
| 2. | 2019-06-26 Mr. Senk's Retention Bonus Agreement | Senk00010-00016 |
| 3. | 2019-06-26 Mr. Senk's Work Product Assignment Agreement | Senk0002-0004 |
| 4. | 2019-06-26 Mr. Senk's Confidentiality and Nonsolicitation Agreement | Senk00017-00021 |
| 5. | 2019-07-12 email to Steve Wilson re Meeting (all GCE emails) | Senk00044 |
| 6. | 2019-07-12 internal GCE mail exchange with GCE senior managers Ms. Shukla and Mr. Gupta | IQVIA-FS-000132 |
| 7. | 2019-08-19 email exchange Novartis staff and Mr. Thakur/Mr. Gupta with cc to GCE emails | IQVIA-FS-000107-000108 |
| 8. | 2019-08-20 email to Mr. Wilson requesting meeting with Ms. Aggarwal | IQVIA-FS-000114 |
| 9. | 2019-08-30 email IQVIA Code of Conduct training | IQVIA-FS-000033-000036 |
| 10. | 2019-12-05 email from Ms. Marhajan detailing Mr. Guduri's tech team work | IQVIA-FS-000097-000100 |
| 11. | 2019-12-11 Mr. Senk's IQVIA Offer Letter from HR | IQVIA-FS-000025-000026 |
| 12. | 2019-12-11 Mr. Senk's Work Product Assignment Agreement | IQVIA-FS-000030-00032 |
| 13. | 2019-12-11 Mr. Senk's Confidentiality and Nonsolicitation Agreement | IQVIA-FS-000027-000029 |
| 14. | 2019-12-09 Mr. Senk's IQVIA Code of Conduct Completion Date | IQVIA-FS-000039 |
| 15. | 2020-02-26 email from IQVIA HR related to offboarding items | IQVIA-FS-000143 |
| 16. | 2020-02-28 Mr. Senk's Ethics Report File | Senk00033-00043 |
| 17. | [Not dated] IQVIA code of conduct presentation | IQVIA-FS-000040-000096 |
| 18. | 2020-03-03 email from IQVIA HR offering Mr. Senk resignation over termination | IQVIA-FS-000138-000139 |
| 19. | 2020-10-07 Deposition Transcript of Frank Senk – *IQVIA, Inc. v. Aggarwal*, C.A. No. 2020-0242-MTZ, 10/7/2020 | IQVIA-FS-000145   - 257 |
| 20. | 2019-07-09 IQVIA Equityholder Restrictive Covenant Agreement ("Equityholder Agreement"). | Equityholder Agreement § 5, |

| | Document | Bates Range |
|---|---|---|
| | | IQVIA's Ex. B filed under seal. |
| 21. | IQVIA Memo. | |
| 22. | Senk Declaration | |

Consistent with Local Rule 106.7, Plaintiff reserves the right to offer additional exhibits at trial to the extent necessary to rebut evidence offered by Defendant, pursuant to the Federal Rules of Evidence, or as justice may require. Plaintiff also reserves the right to rely on demonstrative exhibits not listed in the above table for use at trial. Plaintiff also incorporates by reference every document of defendant.

**Defendant.**[7]

Defendant plans to introduce the following exhibits:

| | Document | Bates Range |
|---|---|---|
| 1. | Mr. Senk's IQVIA Offer Letter | SENK00007-09 IQVIA-FS-0000001-03 |
| 2. | Mr. Senk's Retention Bonus Agreement with IQVIA | SENK00010-16 IQVIA-FS-0000004-10 |
| 3. | Mr. Senk's CRCA (Confidentiality and Restrictive Covenants Agreement) with IQVIA (Feb. 2019 version) | SENK00017-21 IQVIA-FS-000011-15 |
| 4. | IQVIA Code of Conduct | IQVIA-FS-000040 - 096 |
| 5. | August 30, 2019 email linking Code of Conduct | IQVIA-FS-000033-36 |
| 6. | 10/23/2019 email to Frank Senk regarding Required Training | IQVIA-FS-000037 |
| 7. | Frank Senk Code of Conduct Certification | IQVIA-FS-000038 |
| 8. | Frank Senk Training Transcript | IQVIA-FS-000039 |
| 9. | 7/12/2019 email from Frank Senk to Shweta Shukla and copying Nalin Gupta | IQVIA-FS-000132 |
| 10. | 7/12/2019 email from Frank Senk to Steve Wilson | SENK00044 IQVIA-FS-000131 |

---

[7] Separated by exhibits that IQVIA expects to offer and those they may offer if the need arises.

|     | Document | Bates Range |
|-----|----------|-------------|
| 11. | 7/15/2019 email from Frank Senk to Anurag Guduri | IQVIA-FS-000360 |
| 12. | 7/15/2019 email from Frank Senk to Anurag Guduri, Abhay Thakur, and Gaurav Gupta | IQVIA-FS-000360 |
| 13. | 7/16/2019 email from Shweta Shukla to Frank Senk and preceding email chain | IQVIA-FS-000124-130 |
| 14. | 7/17/2019 email from Frank Senk to Shweta Shukla | IQVIA-FS-000439 |
| 15. | 7/23/2019 email from Shweta Shukla to Frank Senk and preceding email chain | SENK00045-49<br>IQVIA-FS-000119-123 |
| 16. | 7/24/2019 email from Anurag Guduri to Abhay Thakur and Rohit Bajaj, copying Frank Senk | IQVIA-FS-000110-111 |
| 17. | 7/25/2019 emails between Shweta Shukla, Gaurav Gupta, and Frank Senk and preceding email chain | SENK00050-54<br>IQVIA-FS-000416 - 419 |
| 18. | 7/25/2019 email reflecting chat between Frank Senk and Neha Aggarwal | IQVIA-FS-000135 |
| 19. | 7/26/2019 email from Frank Senk to Vatsavayi Varma and copying Shweta Shukla and Gaurav Gupta and others, and surrounding email chain | SENK00058-62 |
| 20. | 7/30/2019 email chain: "DocQC" | IQVIA-FS-000109 |
| 21. | 8/1/2019 email chat between Frank Senk and Anurag Guduri | IQVIA-FS-000364 |
| 22. | 8/2/2019 email from Frank Senk to Shweta Shukla and Gaurav Gupta and subsequent email chain and attachment | SENK00055-57 |
| 23. | 8/5/2019 email from Anurag Guduri to Abhay Thakur | IQVIA-FS-000366 |
| 24. | 8/5/2019 email from Shweta Shukla to Frank Senk and copying Gaurav Gupta, with email chain and attachment | IQVIA-FS-000421-423 |
| 25. | 8/7/2019 email from Anurag Guduri to Frank Senk | IQVIA-FS-000106 |
| 26. | 8/20/2019 email from Yves Drogoff to Frank Senk | IQVIA-FS-000424 |
| 27. | 8/20/2019 email from Frank Senk to Steve Wilson | IQVIA-FS-000114 |
| 28. | 8/20/2019 email from Nalin Gupta to Frank Senk | IQVIA-FS-000115 |
| 29. | 9/9/2019 email from Frank Senk to Anurag Guduri | IQVIA-FS-000133 |
| 30. | 9/25/2019 email from Anurag Guduri to Frank Senk | IQVIA-FS-000105 |
| 31. | 10/11/2019 email from Anurag Guduri to Frank Senk and others, and surrounding email chain | IQVIA-FS-000437-438 |
| 32. | 10/17/2019 email from Varsha Mahajan to Frank Senk | IQVIA-FS-000112-113 |

| | Document | Bates Range |
|---|---|---|
| 33. | 12/5/2019 email from Anurag Guduri to Varsha Mahajan and copying Frank Senk and surrounding email chain | SENK00063-66 IQVIA-FS-0000101-104 |
| 34. | 2/26/2020 email chain: "Script for Today" | IQVIA-FS-000136 |
| 35. | 2/28/2020 email from Frank Senk to Anna O'Connor and subsequent email chain | IQVIA-FS-000141 - 42 |
| 36. | 2/29/2020 "Ethics Report" by Mr. Senk | SENK00035-43 |
| 37. | 3/10/2020 email between Frank Senk and Anna O'Connor | IQVIA-FS-000144 |
| 38. | Plaintiff's Responses to IQVIA's First Set of Interrogatories | N/A |
| 39. | Plaintiff's Responses to IQVIA's First Requests for Admission | N/A |

Defendant may also introduce the following exhibits if the need arises:

| | Document | Bates Range |
|---|---|---|
| 40. | Mr. Senk's Work Product Assignment Agreement with IQVIA (Feb. 2019 version) | SENK00022-24 IQVIA-FS-000016-18 |
| 41. | Contribution Agreement Between Gunjan Cutting Edge Solutions, Inc. and ClinTech dated 7/8/2019 | IQVIA-FS-000538 - 566 |
| 42. | 8/18/2019 email: "IS-Shadow: ROI Assessment" | IQVIA-FS-000134 |
| 43. | Mr. Senk's December 2019 Offer Letter with IQVIA | IQVIA-FS-000025-26 |
| 44. | Mr. Senk's July 2019 Transaction-related Bonus Agreement | SENK00001-06 IQVIA-FS-000019-24 |
| 45. | Deposition Transcript of Frank Senk – *IQVIA, Inc. v. Aggarwal*, C.A. No. 2020-0242-MTZ, 10/7/2020 | IQVIA-FS-000145 - 257 |

Consistent with Local Rule 106.7, Defendant reserves the right to offer additional exhibits at trial to the extent necessary to rebut evidence offered by Plaintiff, pursuant to the Federal Rules of Evidence, or as justice may require. Defendant also reserves the right to rely on demonstrative exhibits not listed in the above table for use at trial.

I.      **A list for each party of the name, address, and telephone number of each witness, other than those expected to be called solely for impeachment.**

        ***Plaintiff.***

        Mr. Senk expects to call the following witnesses in its case. Since IQVIA will make its witnesses available by council, plaintiff requests that Ms. Aggarwal be allowed to testify by video communication.

        1.      Mr. Frank Senk, Former GCE Director, 12220 Juniper Blossom Place, Clarksburg

                MD 20871

        2.      Ms. Neha Aggarwal, Former GCE President and Owner, Houston TX

        3.      Mr. Gregg Dearhammer, IQVIA Sr. VP of Data Sciences, Safety and Medical

        4.      Ms. Anna O'Connor, Former IQVIA HR

        Plaintiff reserves the right to call any witness listed below or by the Defendant and any

witnesses necessary to rebut Defendant's evidence.

        5.      Mr. Intikhab Wani, IQVIA VP HR

        6.      Mr. Sukhwinder Singh, Former GCE Chief Financial Officer

        7.      Ms. Varsha Mahajan, Former GCE Director

        8.      Ms. Deubrat Nilu, Former GCE Manager Medical Writing

        9.      Mr. Dan Lanciloti, IQVIA External Lawyer heading up investigation

        10.     Mr. Anurag Guduri, Former GCE Quality Control Analyst

        12.     Mr. Abhissek Mittal, Former GCE Director

        13.     Mr. Costa Panagos, IQVIA President of the Research and Development Services

        14.     Ms. Trudy Stein, IQVIA EVP Chief Human Resources Officer

        Defendant has communicated that Ms. Addie Broussard, Former IQVIA Sr. Director

corporate development data science safety and regulatory and IQVIA interim GCE CFO from

Dec 2019 through 2020, no longer works at IQVIA and has moved to Australia.

31

### *Defendant.*

IQVIA expects to call the following witnesses in its case:

1.   Greg Dearhammer
        Senior Vice President, Data Sciences, Safety and Medical (DSSM), IQVIA
        May be contacted through IQVIA's counsel

2.   Anna O'Connor
        Chief of Staff, US Real World Solutions, IQVIA
        May be contacted through IQVIA'

3.   Plaintiff Frank Senk

Defendant reserves the right to call any witness listed by Plaintiff and any witnesses necessary to rebut Plaintiff's evidence. Defendant maintains that any witness who testifies at trial should be required to appear in person and objects to any request for video testimony at trial.

**J.    A list for each party of the name and specialties of experts the party proposes to call as witnesses including hybrid fact/expert witnesses such as treating physicians.**

None.

**K.    A list of the pages and/or lines of any portion of a deposition to be offered in a party's case in chief or any counter-designations under Fed. R. Civ. P. 32(a)(4).**

### *Plaintiff's Designations.*

Mr. Senk intends to offer the following deposition testimony as affirmative evidence due to the unavailability of the witnesses under Fed. R. Civ. P. 32(a)(4). Mr. Senk also incorporates by reference defense designations.

1.   Frank Senk - Ex. 7; Ex. 10; Ex. 27; 122:5-14; 127:10-17; 128:8-17;

2.   Neha Aggarwal - 79:11-12; 80:1-3; 80:15-19; 82:10-25; 83:1-25; 84:1-25; 85:1-22;

3.   Gregg Dearhammer - 55:24-25; 56:1-6; 82:15-25; 83:1-3; 94:8-23; 94:25; 95:102; 100:18-19;

4.   Addie Broussard – 84:10-16; 85:8-23; 85:8-14; 90:15-25; 91:1-10;

5.   <u>IQVIA Memo</u> – p. 2, 6; p. 4; pp. 19-20; p. 18; pp. 19-20; pp. 20-23; p. 22; p. 26; pp. 26-27; p. 31;

6.   <u>Senk Declaration</u> – p. 4; p. 7; p. 12; p. 13; p. 17; p. 18; p. 23; pp. 41-43;

7.   <u>IQVIA Code of Conduct</u> – p. 26; p.53;

8.   <u>Bonus Agreement</u> - p. 3, § 10

9.   <u>IQVIA counterclaim</u> – pp. 32-33

*__Defendant's Designations.__*

IQVIA intends to offer the following deposition testimony as affirmative evidence due to the unavailability of the witnesses under Fed. R. Civ. P. 32(a)(4):

1.   <u>Neha Aggarwal</u> – 10:3-22; 13:4-10; 13:21-14:9; 15:3-16:23; 17:5-21; 23:4-9; 24:1 -25:1; 25:24-30:7, 31:12-23, 54:4-58:24, 70:15-72:18, 72:19-73:10, 74:5-75:5, 78:5-25, 91:1-93:9, 95:9-96:14, 98:25-102:7, 106:8-108:3, 108:6-110:20, 114:25-116:20, 131:5-132:6.

2.   <u>Addie Broussard</u> – 14:11-15:3, 19:11-24:18, 30:6-33:3, 33:13-34:12, 40:12-43:2, 52:19-55:16, 56:11-60:11, 71:8-76:6, 82:20-86:22, 87:6-89:11, 90:15-92:9

Further, IQVIA reserves the right to use any portions of the deposition transcripts of Mr. Senk for any purpose, including impeachment, pursuant to Fed. R. Civ. P. 32(a)(2).

**L.    Any other pretrial relief, including a reference to pending motions, which is requested.**

Consistent with Local Rules 106.7(b) and 107.5(a), the Parties have made (or will make) available for copying one another's proposed exhibits, except those to be used solely for impeachment.  All exhibits proffered at trial shall be precisely the same in form and substance as the exhibits which were made available for review and copying prior to trial.  Accordingly, at trial,

the Parties need not hand to counsel or one another for review any exhibit which prior to trial was made available for review and copying in accordance with Local Rule 106.7(b).

No opening statement or closing argument shall exceed twenty (20) minutes.  No rebuttal opening statement or rebuttal closing argument is permitted.

During all breaks and recesses, counsel may speak with a witness while conducting a direct examination of the witness but may not discuss testimony with the witness, including a party, while the witness is on cross, re-direct, or re-cross examination.

**M.      Any other matters.**

IQVIA requests that the Court enter the following deadlines for motions *in limine* and post-trial briefing.

- **Briefing schedule for motions *in limine*:**
  - Motions *in limine* due:  March 13, 2024
  - Oppositions due:  March 23, 2024
  - Reply briefs due:  March 28, 2024

- **Briefing schedule for post-trial proposed findings of fact and conclusions of law schedule:**
  - Simultaneous filing of post-trial proposed findings of fact and conclusions of law due: 30 days after the trial transcript is complete.

Dated: February 21, 2024

By: *s/ Frank E. Senk (with permission)*
     Frank E. Senk
     12220 Juniper Blossom Place
     Clarksburg, MD 20871
     Telephone: 215.527.7468
     Email: senkfrank@gmail.com

     *Plaintiff, pro se*


Dated: February 21, 2024

MORGAN, LEWIS & BOCKIUS LLP

By: *s/ Matthew J. Sharbaugh*
     Matthew J. Sharbaugh (D. Md. Bar No. 18942)
     matthew.sharbaugh@morganlewis.com
     Frank H. Williams, III (*pro hac vice*)
     frank.williams@morganlewis.com
     1111 Pennsylvania Avenue, NW
     Washington, DC  20004
     Telephone: +1.202.739.3000
     Facsimile: +1.202.739.3001

     *Attorneys for IQVIA Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 21, 2024, a true copy of the foregoing was served electronically by the Court's CM/ECF system that will serve a true and correct copy on the following:

Frank E. Senk
12220 Juniper Blossom Place
Clarksburg, MD 20871
215.527.7468
Email: senkfrank@gmail.com

*Plaintiff, pro se*